**No. 23-13531**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

Roy S. Moore,

*Plaintiff-Appellee*,

v.

Senate Majority PAC,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Northern District of Alabama
Case No. 4:19-cv-01855-CLM

## INITIAL BRIEF OF APPELLANT SENATE MAJORITY PAC

Barry Alan Ragsdale
**Dominick Feld Hyde, PC**
1130 22nd St. South, Suite 400
Birmingham, AL 35205
Telephone: (205) 536-8888
BRagsdale@dfhlaw.com

William B. Stafford
**Elias Law Group LLP**
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0176
BStafford@elias.law

Marc E. Elias
Christina Ford
**Elias Law Group LLP**
250 Massachusetts Ave NW
Suite 400
Washington, DC 20001
Telephone: (202) 968-4490
melias@elias.law
cford@elias.law

*Counsel for Appellant*

# CERTIFICATE OF INTERESTED PERSONS

Under Eleven Circuit Rule 26.1, Appellant certifies that the following individuals have an interest in the outcome of this case.

1. Bully Pulpit Interactive LLC, *Defendant*

2. Butts, Talmadge, *Attorney for Plaintiff-Appellee*

3. Cecil, Guy, *Defendant*

4. Dominick Feld Hyde, PC, *Attorneys for Defendant-Appellant*

5. Elias, Marc E., *Attorney for Defendant-Appellant*

6. Elias Law Group LLP, *Attorneys for Defendant-Appellant*

7. Ford, Christina, *Attorney for Defendant-Appellant*

8. GMMB Inc., *Parent Corporation of Defendant Waterfront Strategies*

9. Johnson, Melinda K., *Attorney for Defendant-Appellant*

10. Moore, Roy S., *Plaintiff-Appellee*

11. Ragsdale, Barry A., *Attorney for Defendant-Appellant*

12. Priorities USA, *Defendant*

13. Senate Majority PAC (SMP), *Defendant-Appellant*

14. Stafford, William B., *Attorney for Defendant-Appellant*

15. Waterfront Strategies, *Defendant*

16. Velez, Alexi M., *Attorney for Defendant-Appellant*

17. Wittenbrink, Jeffrey S., *Attorney for Plaintiff-Appellee*

*s/ Marc E. Elias*

*Counsel to Appellant*

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, Appellant certifies that Senate Majority PAC has no parent corporation, and no publicly held corporation owns 10% or more of any its stock.

*s/ Marc E. Elias*

*Counsel to Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant SMP requests oral argument. This appeal presents this Court with its first opportunity in twenty-five years to review a jury verdict of actual malice. Given the constitutional requirement that this Court review the record as a whole and make its own independent judgment as to whether the evidence supports a finding of actual malice, oral argument would assist the Court in considering the important issues raised by this appeal.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ........................................................3

STATEMENT OF THE ISSUES............................................................3

STATEMENT OF THE CASE.................................................................4

   I.   Factual and Procedural History ......................................................4

      A. The Allegations and the Ad...................................................4

      B. The Pre-Trial Record ...........................................................10

      C. The Trial Record..................................................................13

         1.  Evidence Concerning Actual Malice ................................14

         2.  Evidence Concerning Moore's Conduct ...........................19

         3.  Evidence Concerning Damages .........................................22

         4.  Closing Arguments and the Court's Final Order ...............22

   II.   Standard of Review .....................................................................23

SUMMARY OF THE ARGUMENT ......................................................24

ARGUMENT .........................................................................................26

   I.   An independent review of the record demonstrates Moore failed to prove actual malice by clear and convincing evidence. ...........................26

      A. Legal Standards ....................................................................27

         1.  Actual Malice and the Defamation-by-Implication Heightened Standard...............................................................27

         2.  The Method of Independent Review...................................29

      B. SMP's unrebutted state-of-mind testimony refutes an actual malice finding.............................................................................30

1. This Court must review questions of SMP's intent *de novo*...............31

2. The Court cannot infer SMP's intent from the Ad itself....................33

3. SMP's unrebutted testimony precludes a finding that Moore established actual malice. ....................................................35

C. Moore did not present any other evidence that would establish clear and convincing evidence of actual malice........................................38

1. Disbelief of SMP's testimony does not establish clear and convincing evidence of actual malice. ..................................38

2. The remaining evidentiary record weighs strongly against a finding of actual malice....................................................39

D. The district court's reasons for finding actual malice were legally erroneous. ............................................................................42

1. A lack of prior reporting expressly stating Moore solicited sex from Miller is not proof of knowledge of falsity. ...............42

2. Complaints about editorial judgment or imprecise language are not proof of actual malice....................................................46

II. The Ad is not sufficiently materially false to sustain a finding of actual malice. ..........................................................................47

A. The "gist" or "sting" of the Ad is true........................................47

B. The Ad is not materially false given the pleaded "truth" of the allegations against Moore..........................................................50

III. The jury instructions were erroneous and prejudicial to SMP by allowing Moore to establish liability and damages based on non-actionable statements...................................................................51

IV. The jury's $8.2 million compensatory award was excessive.....................55

CONCLUSION ....................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
  557 F.3d 1177 (11th Cir. 2009) ..............................................................24, 30, 31

*Air Wisconsin Airlines Corp. v. Hoeper*,
  571 U.S. 237 (2014)....................................................24, 25, 47, 48, 50

*Annette F. v. Sharon S.*,
  119 Cal. App. 4th 1146 (2004) .................................................................37

*Berisha v. Lawson*,
  973 F.3d 1304 (11th Cir. 2020) ......................................................25, 39, 48, 49

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) (en banc) .......................................................37

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984).................................. 23, 27-30, 33, 38, 39, 46, 47

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*,
  861 F.3d 1081 (10th Cir. 2017) .................................................................50

*Christopher v. Cutter Lab'ys*,
  53 F.3d 1184 (11th Cir. 1995) .......................................................51, 52

*Compuware Corp. v. Moody's Invs. Servs., Inc.*,
  499 F.3d 520 (6th Cir. 2007) .................................................................28

*Curtis Pub. Co. v. Butts*,
  388 U.S. 130 (1967)...............................................................................58

*Daphne Auto. v. Pensacola Motor Sales*,
  No. CV-2010-900230, 2011 WL 7657768
  (Ala. Cir Ct. Oct. 31, 2011) ..............................................................56

*Douglass v. Hustler Mag., Inc.*,
  769 F.2d 1128 (7th Cir. 1985) ..............................................................58

*Dunn v. Air Line Pilots Ass'n*,
  193 F.3d 1185 (11th Cir. 1999) ....................................................................27, 33

*Finebaum v. Coulter*,
  854 So. 2d 1120 (Ala. 2003)..........................................................................28, 34

*Greenbelt Co-op. Pub. Ass'n v. Bresler*,
  398 U.S. 6 (1970).................................................................................................51

*Hammet v. Paulding County*,
  875 F.3d 1036 (11th Cir. 2017) ........................................................................38

*Hammond v. City of Gadsden*,
  493 So. 2d 1374 (Ala. 1986).............................................................................55

*Harte-Hanks Commc'ns v. Connaughton*,
  491 U.S. 657 (1989)...........................................................23, 27, 29, 30, 31

*Hill v. Birmingham Broad. (WVTM-TV) LLC*,
  No. CV-2014-904839.00, 2018 WL 10613854
  (Ala. Cir. Ct. Oct. 22, 2018) .............................................................................56

*Howard v. Antilla*,
  294 F.3d 244 (1st Cir. 2002)..............................................................................28

*Janklow v. Newsweek, Inc.*,
  788 F.2d 1300 (8th Cir. 1986) ...........................................................................46

*Kendall v. Daily News Pub. Co.*,
  716 F.3d 82 (3d Cir. 2013) ..................................................................28, 29, 38

*Klayman v. City Pages*,
  650 F. App'x 744 (11th Cir. 2016) ...................................................................41

*Lakey v. Matthew Ross Gilham Media, Inc.*,
  No. CV-2012-902306, 2015 WL 10719179
  (Ala. Cir. Ct. Dec. 7, 2015)........................................................................56, 57

*Lerman v. Flynt Distrib. Co.*,
  745 F.2d 123 (2d Cir. 1984) ..............................................................................58

***Levan v. Cap. Cities/ABC, Inc.*,**
  190 F.3d 1230 (11th Cir. 1999) .................................... 24, 29, 30, 39, 41, 48, 49

*Long v. Arcell*,
618 F.2d 1145 (5th Cir. 1980) ........................................................37, 41

*\*Lovingwood v. Discovery Communications*,
800 F. App'x 840 (11th Cir. 2020) ..........................................44, 45, 46

*Masson v. New Yorker Magazine*,
501 U.S. 496 (1991).................................................................43, 44, 45

*McLaughlin v. Rosanio, Bailets & Talamo, Inc.*,
331 N.J. Super. 303 (App. Div. 2000) .................................................45

*McNely v. Ocala Star-Banner Corp.*,
99 F.3d 1068 (11th Cir. 1996) .......................................24, 51, 53, 54

*Michel v. NYP Holdings, Inc.*,
816 F.3d 686 (11th Cir. 2016) ....................................................36, 40, 41

*Moore v. Baron Cohen*,
No. 21-1702-CV, 2022 WL 2525722
(2d Cir. July 7, 2022) .........................................................................10

*Moore v. Lowe*,
591 F. Supp. 3d 1087 (N.D. Ala. 2022), *appeal dismissed*,
No. 22-13187, 2024 WL 227897 (11th Cir. Jan. 22, 2024) .......................10, 12

*Mosher v. Speedstar Div. of AMCA Int'l, Inc.*,
979 F.2d 823 (11th Cir. 1992) ....................................................24, 53

*\*New York Times v. Sullivan*,
376 U.S. 254 (1964).................................................27, 28, 52, 54, 58

*\*Newton v. Nat'l Broad. Co., Inc.*,
930 F.2d 662 (9th Cir. 1990) ....................... 28, 29, 34, 35, 38, 46, 57

*Palin v. New York Times Co.*,
588 F. Supp. 3d 375 (S.D.N.Y. 2022) .......................................39, 40

*Philadelphia Newspapers, Inc. v. Hepps*,
475 U.S. 767 (1986).............................................................................52

*Rosanova v. Playboy Enters., Inc.*,
580 F.2d 859 (5th Cir. 1978) ..............................................................42

*S.E.C. v. Yun*,
  327 F.3d 1263 (11th Cir. 2003) ............................................................51

*Saenz v. Playboy Enters., Inc.*,
  841 F.2d 1309 (7th Cir. 1988) ...............................................28, 29, 33

*Seith v. Chicago Sun-Times, Inc.*,
  371 Ill. App. 3d 124 (2007) ..................................................................45

*Silvester v. Am. Broad. Cos., Inc.*,
  839 F.2d 1491 (11th Cir. 1988) ...........................................................39

*Simon v. Shearson Lehman Bros., Inc.*,
  895 F.2d 1304 (11th Cir. 1990) ...................................................24, 56

*Smith v. Huntsville Times Co., Inc.*,
  888 So. 2d 492 (Ala. 2004) ...................................................................41

*Time, Inc. v. Pape*,
  401 U.S. 279 (1971) .......................................................................37, 39

*Turner v. Wells*,
  879 F.3d 1254 (11th Cir. 2018) ...........................................................33

*Vest v. Gay*,
  275 Ala. 286 (1963) ...............................................................................55

**Statutes**

28 U.S.C. § 1291 .......................................................................................3

28 U.S.C. § 1332 .......................................................................................3

**Rules**

Fed. R. Civ. P. 50 ....................................................................................23

Fed. R. Civ. P. 59 ....................................................................................23

**Other Authorities**

50 Am. Jur. 2d Libel and Slander § 161 ...............................................28

U.S. Const. amend. I ...................................... 23, 26, 30, 31, 42, 46, 55, 58

**INTRODUCTION**

In November 2017, multiple news outlets credibly reported that then-U.S. Senate candidate Roy Moore sought sexual encounters with girls as young as 14 when he was 32. In total, nine women accused Moore of sexual misconduct. These reports were corroborated by Moore's former co-workers, law enforcement, and employees of the Gadsden Mall, who recalled that Moore's predatory behavior towards teenage girls was so extreme that he was once banned from the mall.

This case involves a campaign ad Senate Majority PAC (SMP) helped air against Moore that presented five accurate quotes from this extensive reporting. The district court properly held that each of the Ad's quotes—including its opening quote, "Moore was actually banned from the Gadsden Mall . . . for soliciting sex from young girls"—was not actionable because each quote was based on widespread reporting, which under Eleventh Circuit precedent negated an inference of actual malice. Moore argued, however, that even if every quotation was accurate, the Ad still defamed him by implying that he had solicited sex from a specific 14-year-old girl, Wendy Miller. The district court erroneously allowed the case to proceed to trial on this narrow claim, the start of a series of cascading legal errors. Reversal is required on several grounds.

*First*, the district court erred in sustaining the verdict because Moore failed to establish, by clear and convincing evidence, that SMP (1) intended the Ad to imply

Moore solicited sex from Miller, and (2) knew that assertion was false or recklessly disregarded that risk. On appeal, the Court must independently review the record to determine whether Moore presented evidence to satisfy these elements. He did not. SMP offered unrebutted testimony that it did not intend the implication Moore ascribes to it. And, given the widespread reporting that Moore "preyed upon girls" at the mall, solicited sex from 14-year-old girls, and made advances towards Miller specifically, any conclusion that Moore sought sex from Miller, too, was reasonable.

*Second*, the district court erred in concluding the Ad was sufficiently materially false to sustain a finding of actual malice. The Ad accurately conveyed the "gist" or "sting" of the allegations against Moore, who was widely and credibly accused of seeking sex from girls of a similar age in multiple news reports before the Ad aired, including in a November 9, 2017 *Washington Post* article that was headlined, "*Woman Says Roy Moore Initiated Sexual Encounter When She Was 14, He Was 32*." Ex. 2. Because material falsity is required for actual malice, this too independently requires reversal.

*Third*, the district court erred in charging the jury with instructions that impermissibly allowed Moore to establish liability for statements the court had already held could not have been made with actual malice. This error severely prejudiced SMP.

*Fourth*, the jury's $8.2 million compensatory award for loss of reputation and mental anguish was excessive and the district court abused its discretion in declining to vacate or remit the award. Moore failed to show the damages he suffered were attributable to the Ad's purported implication about Miller, instead of the tsunami of allegations made against Moore for weeks before the Ad ever aired.

## JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction under 28 U.S.C. § 1332. Doc. 41 at 1 & nn.1-2.[1] The district court denied SMP's motion for judgment as a matter of law on September 29, 2023. Doc. 252. SMP timely filed a notice of appeal on October 13, 2023. Doc. 253. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

**I.** Whether an independent review of the record demonstrates that Moore proved by clear and convincing evidence that SMP acted with actual malice.

**II.** Whether an independent review of the record demonstrates that the Ad was materially false where SMP accurately conveyed the "gist" or "sting" of the reports about Moore.

---

[1] "Doc." refers to filings in the district court's docket, each of which has been provided in an Appendix SMP compiled in consultation with Appellee Moore. Trial transcripts cite the underlying docket number at which that transcript can be found, using the ECF page number as the page cite. Trial exhibits can be found at Doc. 254.

**III.**    Whether the jury instructions were erroneous and prejudicial to SMP in allowing Moore to establish liability and damages based on statements the district court had already held were not made with actual malice.

**IV.**    Whether the district court abused its discretion in sustaining the jury's $8.2 million compensatory award considering Moore's previously tarnished reputation and Moore's failure to prove damages attributable to SMP.

## STATEMENT OF THE CASE

### I.    Factual and Procedural History

#### A.    The Allegations and the Ad

On November 9, 2017, *The Washington Post* reported that Moore initiated a sexual encounter with 14-year-old Leigh Corfman when he was a 32-year-old district attorney. Ex. 2. Moore first met Corfman when he volunteered to watch her while her mother attended a custody hearing. *Id.* at 1-2. Days later, Moore drove Corfman to his house, "told her how pretty she was," fondled her, undressed himself, and shoved her hand over his genitals. *Id.* at 2.

Three other women told the *Post* that Moore similarly pursued them as teenagers. *Id.* One was Wendy Miller, who "was 14 and working as a Santa's helper at the Gadsden Mall when Moore first approached her" and "told her she looked pretty"—echoing Moore's approach of Corfman. *Id.* at 2, 9. Moore later tried to date Miller, but her mother forbade it. *Id.* at 9.

The *Post*'s story, which won the Pulitzer Prize for investigative reporting, Doc. 229 at 45, was followed by a flood of similar reporting, including about Moore's conduct towards young girls at the Gadsden Mall. This included a November 12, 2017 *New American Journal* article reporting that "Moore was actually banned from the Gadsden Mall . . . for his inappropriate behavior of soliciting sex from young girls." Ex. 3 at 2. *The New Yorker* swiftly corroborated that story based on interviews with "five members of the local legal community, two cops who worked in the town, several people who hung out at the mall in the early eighties, and a number of former mall employees" who remembered that "Moore had been banned from the mall because he repeatedly badgered teen-age girls." Ex. 4 at 1-2. *The New Yorker* identified by name former police officer J.D. Thomas, who had told a Gadsden Mall employee, "If you see Roy, let me know. He's banned from the mall." *Id*. at 2.

Alabama-based outlets confirmed this reporting. On November 13, 2017, *AL.com* published, "*Gadsden Locals Say Moore's Predatory Behavior at Mall, Restaurants Not a Secret.*" Ex. 5. A Gadsden local, Blake Usry, who saw Moore at the mall during this time, told *AL.com*, "These stories have been going around this town for 30 years." *Id*. at 2. Teresa Jones, who served alongside Moore as deputy district attorney, agreed: "[I]t was common knowledge about Roy's propensity for

5

teenage girls." *Id*. at 4. "I'm appalled that these women are being skewered for the truth." *Id*.

Four days after the *Post*'s original story, the *New York Times* reported that a fifth accuser, Beverly Nelson, said that Moore violently and sexually assaulted her in his car when she was 16. Ex. 75 at 1. As Alabama Senator Richard Shelby told the *Times*, "It doesn't look good." *Id.* at 2.

On November 15, 2017, the *New York Times* ran a story titled, "*4 More Women Accuse Roy Moore of Misconduct*," bringing the total to nine women. Ex. 120. One was Becky Gray, who worked at the Gadsden Mall as a teenager and helped get Moore banned from the mall. *Id*.; Ex. 99 at 1. As a retired Alabama schoolteacher told the *Times*, "I've known for over 20 years that [Moore] was a predator, that he preyed upon girls in the mall." Ex. 120 at 2.

Political advertisements echoed this extensive reporting. *See, e.g*., Exs. 212, 216, 223. One was from Highway 31, a political action committee (PAC) that worked with SMP to air the Ad at issue. *See* Ex. 1; Doc. 228 at 68, 70. The Ad first aired November 27, 2017, weeks after the above reporting. Doc. 196 at 3, 5. The Ad presented five quotes, each sourced to a previously published news report. *See* Ex. 1; Doc. 252 at 13:









8





When Moore asked TV stations to take the Ad down, the stations refused, satisfied

with the research SMP provided supporting the Ad. Doc. 228 at 142-143.

In 2018, Moore sued Corfman, Nelson, and other accusers for defamation. Doc. 25-3. He lost. Doc. 229 at 9. Moore then sued Sacha Baron Cohen, who suggested he was a pedophile, for defamation. He lost that case, too. *See Moore v. Baron Cohen*, No. 21-1702-CV, 2022 WL 2525722 (2d Cir. July 7, 2022). In 2020, Moore sued *The Washington Examiner* and its journalists for defamation. He lost that case as well. *See Moore v. Lowe*, 591 F. Supp. 3d 1087 (N.D. Ala. 2022), *appeal dismissed*, No. 22-13187, 2024 WL 227897 (11th Cir. Jan. 22, 2024).

## B.    The Pre-Trial Record

Moore initiated this lawsuit in 2019, during his second run for U.S. Senate. Doc. 1. In it, he alleged that SMP, Priorities USA and its President, Guy Cecil, Bully Pulpit Interactive, and Waterfront Strategies defamed him through a variety of tweets, press statements, and advertisements concerning Moore's sexual advances on teenage girls, including the Ad at issue here. Doc. 1. Moore alleged that every statement in the Ad was defamatory, including the statement that "Moore was actually banned from the Gadsden mall . . . for soliciting sex from young girls." *Id.* ¶¶ 14-30. He separately alleged defamation-by-implication, arguing the Ad implied he solicited sex from Miller specifically when, he contended, he had never done so. *Id.* ¶ 66.

Defendants moved to dismiss, arguing Moore had not plausibly alleged actual malice. Doc. 25. As for Moore's defamation-by-implication claim, SMP also

emphasized that "the TV Ad did not say that Moore solicited sex from Miller." Doc. 33 at 7. It said he "approached" her, a fact that was widely reported. But even if the Ad could be understood the way Moore interpreted it, given the extensive reporting that Moore had a "pattern of picking up teenage girls from public locations and trying to have sex with them," SMP had "reason to believe that in approaching Miller when she was 14, Moore *was* seeking sex." *Id*. at 7.

The district court dismissed nearly all of Moore's claims, finding that, because the statements were based on widespread reporting, he could not prove actual malice. Doc. 45, 61. The sole exception was Moore's narrow defamation-by-implication and corresponding false-light claim, which the district court declined to dismiss. Doc. 45, 61. In discovery, Defendants produced hundreds of documents related to the Ad's creation and sat for depositions in which Moore had ample opportunity to inquire into SMP's state of mind in publishing the Ad.

On summary judgment, the district court again confirmed that, given pre-existing reporting, Moore could not "prove that the Defendants had actual malice in publishing the [Ad's first] statement that 'Moore was actually banned from the Gadsden Mall . . . for soliciting sex from young girls.'" Doc. 149 at 7 (citing *Berisha v. Lawson*, 973 F.3d 1304, 1313 (11th Cir. 2020)).[2] It nonetheless allowed the case

---

[2] As the district court explained in more detail in related litigation, (1) "previous reporting corroborated the statement (or implication) that authorities banned Moore

to proceed to trial on Moore's narrow claim "that the Defendants juxtaposed quotes to create the false and defamatory message that Moore solicited sex from a 14-year-old girl working as Santa's Helper at the Gadsden Mall," because "there was no prior report that Moore asked Wendy Miller for sex." Doc. 149 at 7.

Before trial, SMP requested that the jury be instructed that this was the only remaining actionable false statement before it. Doc. 173 at 5. The court refused, believing Moore could prove falsity if *any* statement in the Ad was false—even if the same statement could not support a finding of actual malice. Doc. 200 at 3-4; Doc. 229 at 10-13. Thus, the court proceeded to instruct the jury that it could find falsity if "SMP made *a* false statement about Moore," Doc. 206 at 7, actual malice if SMP "knew that [the Ad] conveyed *a* false statement about Moore" or recklessly disregarded that risk, *id.* at 9, and it could award damages if "SMP's publication of *a* false statement" caused Moore harm, without ever identifying for the jury *which* false statement in the Ad was at issue, Doc. 207 at 2 (emphasis added in all); *see also infra* at 31-32, 52 (SMP's objections and proposed instructions).

---

from the mall[,]" (2) "reporting corroborated . . . that the reason for the ban was that Moore sexually preyed on underage girls[,]" and (3) "reporting even corroborated the implication that the reason for the ban was that Moore solicited sex from underage girls." *Lowe*, 591 F. Supp. 3d at 1113-14.

### C.    The Trial Record

At trial, Moore largely ignored his sole remaining defamation-by-implication claim; instead, he attempted to prove he was never banned from the Gadsden Mall—at least, not *officially*. *See, e.g.*, Doc. 228 at 38 (Moore's attorney in opening statement: "We will bring several law enforcement officers and people who have worked at the Gadsden Mall for many years, and they will tell you he was never banned from the Gadsden Mall."). Similarly, Moore presented twelve witnesses (mostly family or long-time friends), who testified Moore had never been banned from the Gadsden Mall or solicited sex from young girls (or that they had never heard such a thing). *None* of the 17 exhibits Moore introduced addressed the question of SMP's intent or state of mind. *See* Exs. 1-5, 28-39.

SMP introduced hundreds of exhibits, including dozens of published stories about Moore's interactions with underage girls that SMP had relied upon, internal documents showing SMP's awareness of these allegations and its careful vetting of the Ad, and as relevant to damages, evidence reflecting the many allegations made about Moore that destroyed his reputation before the Ad ever aired. *See* Exs. 40-65, 67-93, 95-172, 177-196, 198-212, 215-240, 246-254. Five witnesses testified about the Ad itself: Diana Astiz (SMP's Research Director), J.B. Poersch (SMP's President), Adam Muhlendorf (Highway 31's Spokesperson), Jesse Demastrie (an employee of Waterfront Strategies), and expert Dr. Barbara Ziv. SMP also presented

13

three witnesses to speak to Moore's behavior at the Gadsden Mall: Wendy Miller,

Becky Gray, and former security guard J.D. Thomas.

### 1.    Evidence Concerning Actual Malice

The evidence established that in November 2017, SMP's Research

Department gathered reporting from reputable news agencies about Moore's

encounters with teenage girls, Doc. 229 at 183-185, including:

> Washington Post: *Woman Says Roy Moore Initiated Sexual Encounter When She Was 14, He Was 32* (Ex. 2)
>
> The New Yorker: *Locals Were Troubled by Roy Moore's Interactions with Teen Girls at the Gadsden Mall* (Ex. 4)
>
> AL.com: *Gadsden Locals Say Moore's Predatory Behavior at Mall, Restaurants Not a Secret* (Ex. 5)
>
> Washington Post: *Two More Women Describe Unwanted Overtures by Roy Moore at Alabama Mall* (Ex. 89)
>
> ABC: *Roy Moore Accuser: I Got Him Banned from the Mall* (Ex. 99)
>
> The Hill: *Former Alabama Police Officer: We Were Told to Make Sure Moore Didn't Hang Around Cheerleaders* (Ex. 165)
>
> Politico: *McConnell: 'I Believe the Women' Accusing Roy Moore* (Ex. 63)

In SMP's view, that "this many people [came] forward with their name on the

record" to allege misconduct bolstered the credibility of the accusations. Doc. 229

at 203. SMP's Research Director, SMP's President, and Highway 31's Spokesperson

all testified they believed these allegations against Moore. Doc. 229 at 225-226

14

(Astiz); Doc. 228 at 127 (Poersch); Doc. 228 at 97 (Muhlendorf). And SMP found the stories of Moore "trying to pick up young girls at the mall" particularly credible given the level of detail the women shared. Doc. 229 at 209. For example, one young woman reported she and co-workers created a "warning system" so they would have "time to hide" when Moore came in; another said they "dr[e]w straws" when forced to interact with him. Doc. 229 at 209, 211-212.

The unrebutted evidence also established that the Ad was carefully vetted before it aired. Astiz testified in detail to SMP's vetting process, including for this Ad in particular. The Research Department went "line by line by line by line" to make "sure that every single thing was factually accurate," creating a research-backup document in the process. Doc. 229 at 188. After the Ad was produced, it was again reviewed "line by line by line" to ensure any necessary edits were incorporated. Doc. 229 at 189. As Astiz testified: "My entire job was about making sure that everything we put out was accurate," Doc. 229 at 191, and she was confident the Ad met that standard. Doc. 229 at 218-224, 226.

Exhibit 162 was the "research backup" document that SMP's Research Team created, and Astiz approved, before the Ad aired, Doc. 229 at 218-219:

15

4:19-cv-01855-CLM
Moore v. SMP, et al.
Exhibit 162

| Ad | Research Backup |
|---|---|
| V/O: What do people who know Roy Moore say?<br><br>TEXT: What do people who know Roy Moore say? | |
| V/O: Roy "Moore was actually banned from the Gadsden Mall…for soliciting sex from young girls."<br><br>TEXT: "Moore was actually banned from the Gadsden Mall…for soliciting sex from young girls."<br><br>CITE: New American Journal, 11/12/17 | **New American Journal: "Moore Was Actually Banned From The Gadsden Mall…For Soliciting Sex From Young Girls."** "Sources tell me Moore was actually banned from the Gadsden Mall and the YMCA for his inappropriate behavior of soliciting sex from young girls." [New American Journal, 11/12/17]<br><br>**ABC News: Alabama Woman Said Moore Was Banned From Gadsden Mall After Repeated Unwanted Advances.** "An Alabama woman who has accused Republican U.S. Senate candidate Roy Moore of sexually harassing her in the late 1970s said he was banned from the mall where she worked after she complained about his repeated, unwanted advances toward her. 'I went to my manager and talked to him about it and asked him, basically, what could be done,' Becky Gray told ABC News late Wednesday night. 'Later on, he…came back through my department and told me that [Moore] had been banned from the mall." [ABC News, 11/16/17]<br><br>**New Yorker: "Moore Had Been Banned From The Mall Because He Repeatedly Badgered Teen-Age Girls."** "This past weekend, I spoke or messaged with more than a dozen people—including a major political figure in the state—who told me that they had heard, over the years, that Moore had been banned from the mall because he repeatedly badgered teen-age girls. Some say that they heard this at the time, others in the years since. These people include five members of the local legal community, two cops who worked in the town, several people who hung out at the mall in the early eighties, and a number of former mall employees." [New Yorker, 11/13/17]<br><br>**Retired Alabama Police Officer: "We Were Advised That He Was Being Suspended From The Mall."** "A retired Alabama police officer said police were told in the 1970s to make sure now-GOP Senate candidate Roy Moore stayed away from high school cheerleaders. Former Gadsden police officer Faye Gary told MSNBC that the 'rumor mill was that he liked young girls.' 'We were advised that he was being suspended from the mall because he would hang around the young girls that worked in the stores and, you know, really got into a place of where they say he was harassing,' former Gadsden police officer Faye Gary told MSNBC on Tuesday." [The Hill, 11/22/17]<br><br>**AL.com: Mall Employees Warned About Moore, Who "Often Walked Alone Around The Gadsden Mall."** "Colleagues and others who knew Moore told the Washington Post that he often walked alone around the Gadsden Mall…Jason Nelms, who now |

SMP_00000984

| | lives in Tennessee but grew up in nearby Southside, was a regular at the mall when he was a teenager. He recalled being told by a mall employee that they kept watch for an older guy who was known to pick up younger girls. Nelms said he was told later by a concession worker at the mall that it was Roy Moore." [AL.com, 11/13/17] |
|---|---|
| | • **AL.com: Mall Security Guard Told Mall Employee To Alert Security If Moore Was Seen.** "Legat, now 59, said an off-duty Gadsden police officer named J.D. Thomas told him about various people he should look out for when he was working. This was around 1981, and Thomas worked security at the mall. One of the people was a pickpocket, he said, while another was someone prone to pick fights. One was Roy Moore. 'I asked him, 'What did he do?' Legat recalled. 'He said, 'If you see him, let me know. I'll take care of it.''" [AL.com, 11/13/17] |
| V/O: One he approached "was 14 and working as Santa's helper." TEXT: One he approached "was 14 and working as Santa's helper." CITE: AL.com, 11/13/17 | **AL.Com: Moore Flirted With Girl At Mall Who "Was 14 And Working As Santa's Helper."** "Colleagues and others who knew Moore told the Washington Post that he often walked alone around the Gadsden Mall…Wendy Miller told The Post that she was 14 and working as Santa's helper at the Gadsden Mall in 1977 when Moore first spoke with her and told her she looked pretty." [AL.com, 11/13/17] <br><br> • **Girl Was Approached By Moore At Age 14, Asked Out On Dates At Age 16.** "Wendy Miller says she was 14 and working as a Santa's helper at the Gadsden Mall when Moore first approached her, and 16 when he asked her on dates, which her mother forbade." [Washington Post, 11/09/17] |
| V/O: "These stories have been going around this town for 30 years." TEXT: "These stories have been going around this town for 30 years." CITE: Blake Usry, AL.com, 11/13/17 | **Blake Usry In AL.Com: "These Stories [On Moore] Have Been Going Around This Town For 30 Years.** "And yet people who lived in Etowah County during that time have said Moore's flirting with and dating much younger women and girls was no secret. 'These stories have been going around this town for 30 years,' said Blake Usry, who grew up in the area and lives in Gadsden." [AL.com, 11/13/17] |
| V/O: "These women are being skewered for the truth." TEXT: "These women are being skewered for the truth." | **Teresa Jones In AL.Com: "These Women [Moore's Victims] Are Being Skewered For The Truth."** "Teresa Jones, who said she worked at the Etowah County District Attorney's Office with Moore, took to Twitter on Friday to say it was "common knowledge" that he pursued teenage girls. 'As a Deputy DA in Gadsden when Roy Moore was there, it was common knowledge about Roy's propensity |

SMP_00000985

17

After the Ad began running, Moore demanded that TV stations take it down. *See* Doc. 228 at 142-143. When that happens, TV stations commonly request the research backup for the Ad to judge an advertisement's truthfulness for themselves. *Id.* After reviewing Moore's objection and the backup provided by SMP, the TV stations continued to air the ad. *Id.*

Every witness from SMP and Highway 31 testified that they had no doubts about the truthfulness of the Ad. *See* Doc. 229 at 226 (Astiz); Doc. 228 at 127 (Poersch); Doc. 228 at 97-98 (Muhlendorf). There was no contrary evidence. The testimony was also unrebutted that SMP did not intend for the Ad to convey that Moore had expressly solicited sex from Miller. Doc. 229 at 216, 224-225 (Astiz); Doc. 228 at 117-118, 127-128 (Poersch); Doc. 228 at 77, 79-80 (Muhlendorf). As SMP explained, the fact that Moore approached 14-year-old Miller while she was working as a Santa's helper was, in SMP's view, damning enough to warrant inclusion. Doc. 229 at 224-225 (Astiz); Doc. 228 at 117-118, 127-128 (Poersch); Doc. 228 at 75-77, 79-80 (Muhlendorf).

Instead of attempting to create a new story, as Moore alleged, the unrebutted testimony was that the goal of the Ad "was to take stories that were in the public domain, share them with the general public," and let them decide "whether or not they wanted to support Roy Moore." Doc. 228 at 77 (Muhlendorf). To do this, the

Ad "provided the citation from where the quotes were pulled from," to "invite[]
people to investigate, read more, learn more for themselves." Doc. 228 at 86.

Although it was not the Ad's intended message, SMP's witnesses testified that
they *did* believe Moore's purpose in approaching Miller was to make a sexual
solicitation. Doc. 228 at 77-78; Doc. 229 at 224-225. This was based on, among
other things, the plethora of news reports that Moore "was soliciting sex from 14-
year-olds and 16-year-olds," Doc. 228 at 78, "preyed upon girls" at the mall
specifically, *see supra* at 6, and the *Post*'s account of Miller's encounter with Moore
that described an approach eerily similar to his approach of Corfman, who was also
14 years old when he approached her in public to flirt with her, and whom he
sexually assaulted once he got her alone. *See* Ex. 2.

### 2. Evidence Concerning Moore's Conduct

Becky Gray testified she worked at the Gadsden Mall between 1974 and 1983.
Doc. 224 at 6-7. Gray recalled that, for a time, Moore was at the mall "almost every
Friday and Saturday night," flirting with girls aged 12 to 15. Doc. 224 at 8-9. Gray,
who was then 18 or 19, thought that Moore "was way too old to be talking to girls
that age." Doc. 224 at 9. Eventually, Gray "would hide back in the dressing rooms"
when Moore came in, and at some point complained to her manager, who later
informed her that Moore was banned from the mall. Doc. 224 at 10-11, 22.

Wendy Miller (neé Brackett) testified she first met Moore in 1977 when she was 14 working as Santa's helper. Doc. 224 at 80. Moore approached her, told her she looked pretty, and asked if he could buy her a Coke. Doc. 224 at 80-81. She accepted, and Moore continued to visit her, flirt with her, and buy her Cokes. Doc. 224 at 84-86. When she was 16, Moore asked Miller's mom, Martha Brackett, if he could date Miller. Doc. 224 at 86-87, 90. Her mother responded by reporting Moore to J.D. Thomas, a security guard at the mall. Doc. 224 at 91-92, 110, 111.

Thomas testified that, during a "month to six-week[]" period in the late 1970s, he received approximately ten complaints about Moore. Doc. 224 at 111-112. Most were from "young girls, teenage girls," whom Moore was trying to date or pick up. Doc. 224 at 112. Thomas eventually pulled Moore aside, "tried to be as tactful as possible because Roy was an upstanding citizen, you know, at that time," and told Moore to "cool it." Doc. 224 at 112. But the complaints did not stop.

Thomas confirmed that one complaint was from Martha Brackett, who complained Moore was making inappropriate sexual advances (and specifically, an "unwanted sexual solicitation") towards Miller. Doc. 224 at 130. Eventually, Thomas told Moore, "I'm going to have to ban [you] from the mall." Doc. 224 at 112-113. Because Moore was a prominent figure within the district attorney's office and worked closely with Thomas's own police department, Thomas never wrote in an official ledger that Moore was banned or spread news of it widely, hoping to spare

20

everyone involved, including Moore, from embarrassment. Doc. 224 at 115-116.

Thomas did tell at least one mall employee that Moore had been banned. Doc. 224

at 117. He could not remember whether he told other security officers about the ban

or Brackett's complaint. He testified: "If I did, it would have possibly been Terry

White," "[i]f [W]hite was working that day." Doc. 224 at 132.[3]

Finally, Moore testified in his own defense that everything his accusers said—

including the allegation that he had been "banned from the mall"—were lies and his

punishment for "challenging the authority of the establishment in Washington, D.C."

Doc. 222 at 196, Doc. 229 at 21, 99. He conceded it was possible, however, that he

had approached Miller when she was 14 to tell her that she looked pretty. Doc. 229

at 102.

---

[3] Moore called Terry White, who testified he did not recall hearing that Moore had been banned. Doc. 222 at 110. But White also testified that there was a two-year period during the late 1970s when he did not work at the mall and that he believed Thomas to be an honest person who would not lie under oath. Doc. 222 at 119-120. Moore's other witnesses who testified they never heard of a ban were: Brenda Boyle, the wife of a former mall manager, who admitted they did not live in Gadsden during the relevant timeframe, Doc. 222 at 9-10; Johnny Adams, who worked at the mall decades later, Doc. 222 at 42, 44; J.B. Jeffers, who testified he never saw Moore at the mall at all, Doc. 229 at 121-122; Moore's wife, Kayla Moore, who did not meet Moore until 1984, Doc. 222 at 82; Moore's adult daughter Heather Mayo; Moore's sister, Toni Moore Martin; her best friend, Genia Craft; Moore's two other friends, Connie Wilkerson and Jimmie Flanagan; and Leonard Holifield, Moore's employee since 1998.

### 3. Evidence Concerning Damages

Before the Ad aired, Moore was the subject of hundreds of news articles, advertisements, tweets, and other statements calling him a sexual predator, pedophile, and more. *See* Exs. 40-65, 67-93, 95-172, 177-196, 198-212, 215-240, 246-254. Moore did not present a damages expert at trial, instead relying on testimony from himself and his family. But that testimony established only that Moore's claim for damages was traceable to earlier reporting. Although Moore's wife and daughter originally implied that, following the Ad, the word "pedophile" was painted on the family's driveway, they felt uncomfortable going to church, and felt humiliated in public, Doc. 222 at 76-78 (Kayla Moore); Doc. 222 at 129-130 (Mayo), each admitted on cross-examination that, in Moore's earlier defamation case against Corfman, they had testified that these incidents—and the same allegedly resulting damages—arose from the original *Post* story. Doc. 222 at 94-97 (Kayla Moore); Doc. 222 at 135-140 (Mayo); Doc. 229 at 88 (Roy Moore). When asked by his counsel whether his damages were attributable to SMP, Moore admitted he could not connect them to the Ad: "[d]amages are like . . . germs. You don't know where they come from." Doc. 229 at 107.

### 4. Closing Arguments and the Court's Final Order

In closing, Moore's counsel focused on SMP's "failure" to prove Moore was *actually* banned from the mall. Doc. 225 at 33, 65. And although Moore was not

22

entitled to punitive damages under Alabama law, *see* Doc. 200 at 3-4, his counsel asked the jury to punish SMP, which he argued had relied on untrustworthy liberal media sources like *The Washington Post* and *New York Times*, Doc. 225 at 27-28, urging the jury to "award [Moore] enough money . . . to make the media pay attention," Doc. 225 at 34, and emphasizing SMP was a "super PAC" that had "a lot of money." Doc. 225 at 21. Soon thereafter, the jury awarded Moore $8.2 million. Doc. 207.

After Moore rested, SMP moved for judgment as a matter of law, Doc. 229 at 164; Doc. 202, which the court denied, Doc. 229 at 166-168. After the verdict, SMP renewed its Rule 50 motion and moved for a new trial under Rule 59, Doc. 225 at 80-81; Doc. 216, which the court also denied, Doc. 252.

## II.    Standard of Review

"[W]hether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 685 (1989). This Court must independently examine "the whole record" to ensure the judgment is consistent with the First Amendment. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984) (quoting *New York Times v. Sullivan,* 376 U.S. 254, 284 (1964)). Although the pure truth or falsity of a publication is reserved to the jury, the Court may determine for itself whether the publication is so *materially* false to sustain a finding of actual malice.

23

*See, e.g.*, *Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237, 250 (2014); *Levan v. Cap. Cities/ABC, Inc.*, 190 F.3d 1230, 1240-41 (11th Cir. 1999).

Whether the district court erred in charging the jury is a question of law. *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1072 (11th Cir. 1996). This Court should reverse if "the charge, taken as a whole, is erroneous and prejudicial." *Mosher v. Speedstar Div. of AMCA Int'l, Inc.*, 979 F.2d 823, 824 (11th Cir. 1992).

Whether the district court erred in refusing to remit or vacate the damages award because it is excessive is reviewed for an abuse of discretion. *Simon v. Shearson Lehman Bros., Inc.*, 895 F.2d 1304, 1310, 1320 (11th Cir. 1990).

## SUMMARY OF THE ARGUMENT

There was no evidence, let alone clear and convincing evidence, to support a finding of actual malice. To prove actual malice in this defamation-by-implication case, Moore had to prove both that (1) SMP *intended* the Ad to communicate that Moore solicited sex from Miller and (2) SMP knew that assertion was false or recklessly disregarded that risk. He proved neither.

In conducting its independent review, this Court evaluates SMP's intent *de novo*. *See ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1206 (11th Cir. 2009). It cannot defer to the jury's findings on this crucial question, nor may it assume SMP's intent from the Ad itself. As courts have recognized, such an

approach would improperly elevate the Court's own view of the impression of the publication for that of the defendant's, the critical inquiry for actual malice.

Moore did not show by clear and convincing evidence that SMP intended what Moore argues, much less that it did so knowing that the Ad conveyed a false message or with reckless disregard for the truth. SMP's testimony regarding its state of mind was unrebutted and corroborated by the documentary evidence, including evidence that SMP carefully fact-checked the Ad. Moreover, given the reporting that Moore had a reputation for serially "preying" on young girls at the mall and had pursued sexual encounters from girls as young as 14, Moore could not show it was reckless to have believed he approached Miller for the same purpose. *See, e.g.*, Ex. 2 ("*Woman Says Roy Moore Initiated Sexual Encounter When She Was 14, He Was 32.*").

Nor does the record support a finding that the Ad is sufficiently materially false to constitute actual malice. *See Hoeper*, 571 U.S. at 250. The "gist" of the Ad is that it was widely reported that Moore had a pattern of making sexual advances towards teenage girls. That is true; even Moore does not dispute that. The Ad's implication about Miller, to the extent a viewer understood one, is "a relatively immaterial detail in the context of the [Ad] overall," *Berisha*, 973 F.3d at 1316, when the "truth" of the allegations against Moore, including that he sought sex from *other* 14-year-olds when he was in his thirties, was no better.

25

These failures to prove actual malice each independently require reversal. But even if the Court were to find against SMP on both points, reversal of the judgment would still be required because the jury instructions, given over SMP's objections, erroneously allowed Moore to establish liability based on statements the court had already held could not sustain a finding of actual malice. Because the jury was almost certainly confused about what statement was at issue—including whether Moore was "actually banned" from the mall—the risk that the jury found liability and imposed damages based on that non-actionable statement is intolerably high and necessitates reversal.

Finally, the jury's $8.2 million compensatory award—to SMP's knowledge, the largest compensatory defamation award in Alabama history—is excessive and unsupported by the record, which effectively included *no* evidence to support any measure of damages. Considering the countless damaging allegations made against Moore before this Ad ever aired, SMP could not have caused more than nominal damages to Moore.

**ARGUMENT**

## I.    An independent review of the record demonstrates Moore failed to prove actual malice by clear and convincing evidence.

Because the First Amendment protects robust debate in campaigns, the alleged defamation of a "'candidate for elective office presents what is probably the strongest possible case for application of the *New York Times* rule,' . . . and the

26

strongest possible case for independent review." *Harte-Hanks*, 491 U.S. at 686-87 (quotation omitted). As a result, on review, this Court is required to conduct an independent review of the relevant evidence—including SMP's testimony to its state of mind in publishing the Ad, documentary evidence showing its extensive vetting process, the Ad's direct citation to the news sources themselves, and the context in which it was aired—which refutes a finding of actual malice. As the U.S. Supreme Court has held, mere disbelief of a defendant's own state-of-mind testimony does not establish clear and convincing evidence of actual malice. *Bose*, 466 U.S. at 512. Instead, affirmative evidence is required. Because that affirmative, independent evidence is lacking in this case, this Court must reverse.

### A.    Legal Standards

#### 1.    Actual Malice and the Defamation-by-Implication Heightened Standard

In *New York Times v. Sullivan*, the Supreme Court held that public-figure plaintiffs like Moore cannot recover for defamation unless they prove the statement was made with "actual malice," 376 U.S. at 279-80, which requires "clear and convincing evidence" that "the defendant realized that his statement was false or that he subjectively entertained serious doubt as to its truth." *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1198 (11th Cir. 1999) (cleaned up). The *Sullivan* case, which itself concerned an inflamed Alabama jury verdict against an out-of-town defendant, is grounded in the understanding that "erroneous statement is inevitable in free

debate, and that it must be protected if the freedoms of expression are to have the breathing space they need to survive." 376 U.S. at 271-72 (cleaned up). For that reason, "there is a significant difference between proof of actual malice and mere proof of falsity." *Bose*, 466 U.S. at 511.

Defamation-by-implication cases require plaintiffs to make a heightened showing. Defamation-by-implication "occurs when a defendant juxtaposes a series of facts to imply a defamatory connection between them." 50 Am. Jur. 2d Libel and Slander § 161. Every circuit that has considered the issue has required such plaintiffs prove, by clear and convincing evidence, not only that the defendant knew the underlying assertion was false or was reckless about its falsity, but also that the defendant *intended to communicate* the defamatory implication. *See Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1318 (7th Cir. 1988); *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 90 (3d Cir. 2013); *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 528-29 (6th Cir. 2007); *Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002); *Newton v. Nat'l Broad. Co., Inc.*, 930 F.2d 662, 680 (9th Cir. 1990). Although actual malice is a question of federal constitutional law, Alabama law requires the same. *See Finebaum v. Coulter*, 854 So. 2d 1120, 1124-25 (Ala. 2003).

It is an error of law to infer intent to communicate a defamatory message because the statement's defamatory implication is purportedly "obvious"; the "subjective nature of this inquiry requires" showing "that the *defendants themselves*

understood the potential defamatory meaning of their statement." *Kendall*, 716 F.3d at 93 (emphasis added); *see also Newton*, 930 F. 2d at 680-81 (holding that even a "clear and inescapable" defamatory implication to the court or jury cannot substitute for the defendant's own state of mind, and reversing jury verdict on those grounds); *Saenz*, 841 F.2d at 1318 (affirming lack of actual malice and explaining, "[s]imply because a statement reasonably can be read to contain a defamatory inference does not mean" the publisher "intended the statement to contain such a defamatory implication" (quotation omitted)).

### 2.     The Method of Independent Review

"[W]hether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law," *Harte-Hanks*, 491 U.S. at 685, and requires an "independent examination of the entire record" by this Court. *Levan*, 190 F.3d at 1239 (citing *Sullivan*, 276 U.S. at 285); *Bose*, 466 U.S. at 499. In other words, whether a defendant acted with actual malice is not a factual finding for which this Court can defer to the "jury or [] trial judge." *Bose*, 466 U.S. at 501. An appellate court may defer to a jury's credibility determination "concerning the *subsidiary* facts underlying the jury's finding of actual malice," if the appellate court knows the jury "*must* have" made that determination in reaching its verdict. *Harte-Hanks*, 491 U.S. at 659, 689-90. But an appellate court cannot defer to subsidiary

29

factual or credibility determinations the jury "could have" or "may have" made in reaching its verdict. *Id.*

Since *Bose* and *Harte-Hanks*, the Eleventh Circuit has reviewed only one jury verdict of actual malice, in which it reversed the jury's verdict for want of clear and convincing evidence of actual malice. *Levan*, 190 F.3d at 1241. Because the "crucial evidence that relates to the actual malice element [was] undisputed" in that case (as SMP will show it is here), the Court did not have to defer to *any* jury credibility determinations. *Id.* at 1239 n.27.

Since *Levan*, this Court has conducted independent reviews in other First Amendment contexts, holding that it will "review for clear error *only* the . . . ordinary historical facts"—"the who, what, where, when, and how of the controversy." *ACLU*, 557 F.3d at 1206 (emphasis added). But this Court gives "no deference" to findings involving the core, constitutional facts, including, for example, a defendant's "intent," "motive," or inferences of "why" the defendant acted the way it did. *Id.* at 1205.

**B.    SMP's unrebutted state-of-mind testimony refutes an actual malice finding.**

An independent review of the record demonstrates Moore failed to prove actual malice by clear and convincing evidence, necessitating reversal.

### 1. This Court must review questions of SMP's intent *de novo*.

Under *ACLU* and *Harte-Hanks*, this Court must determine SMP's intent *de novo*. Although this standard should have applied below, the district court treated the jury's purported finding on intent as if it were a fact subject to clearly erroneous review. *See* Doc. 252 at 55. That was error for two reasons.

*First*, under binding Eleventh Circuit precedent, when a court engages in an independent review to ensure compliance with the First Amendment, questions of intent are reviewed *de novo*. *ACLU*, 557 F.3d at 1203-07. That alone should end the issue. *Second*, the district court erred in deferring to the jury on the question of whether SMP intended to convey that Moore solicited sex from Miller because it was not a determination this Court can know the jury "*must* have" made, *Harte-Hanks*, 491 U.S. at 689-90, given the jury form the district court employed over SMP's objections.

Because defamation-by-implication claims require the jury to find both that the defendant acted with actual malice *and* that the defendant intended the "implied" meaning at issue, SMP requested that the jury be required to make an express finding on both points, proposing the following questions:

**Do you find that Roy S. Moore proved by clear and convincing evidence:**

4. That SMP intended the audience of the Shopping Mall ad to come away with the impression that Moore solicited sex from a 14-year-old girl working as Santa's Helper at the Gadsden Mall or recklessly disregarded that risk?                          YES          NO

5. That SMP knew this assertion was false or acted with reckless disregard to whether that assertion was false?          YES          NO

Doc. 204 at 1 (highlighting in original). Although the district court agreed Moore needed to prove SMP's intent to communicate the defamatory message, *see* Doc. 252 at 2, 28, it issued the following pattern instructions instead:

**Do you find that Roy S. Moore proved by clear and convincing evidence:**

4. That SMP published the statement with actual malice (that is, SMP knew that a statement was false or acted with reckless disregard to whether a statement was false)?                    NO

Doc. 207 at 1.

The district court's decision to reject SMP's proposed jury form, combined with its repeated refusal to clarify *what* false statement was at issue, *see infra* at 51-52, makes it impossible to know (1) whether the jury made an independent finding on SMP's *intent* in publishing the Ad, as is required for defamation-by-implication and (2) whether the jury's actual malice finding is about the Miller implication specifically, or about the mall ban, which was not actionable, *see supra* at 11-12.

Accordingly, the Court is required to undertake an independent, *de novo* assessment of SMP's intent, giving no deference to the jury's alleged finding on SMP's intent in publishing the Ad.

### 2.    The Court cannot infer SMP's intent from the Ad itself.

Although the language of the publication is relevant to determine whether a publication is *capable* of a defamatory impression, a hurdle a plaintiff must clear to get past a motion to dismiss, *see Turner v. Wells*, 879 F.3d 1254, 1262-63 (11th Cir. 2018), it is error to conclude a defendant *intended* to communicate a defamatory message simply because the publication's defamatory implication is purportedly "obvious" to the average reader.

As the Seventh Circuit explained in a seminal defamation-by-implication case, "[s]imply because a statement reasonably can be read to contain a defamatory inference does not mean . . . the publisher of the statement either intended the statement to contain such a defamatory implication or even knew that the readers could reasonably interpret the statements to contain the defamatory implication." *Saenz*, 841 F.2d at 1318 (quotation omitted). This principle of law follows directly from *Bose*, which refused to assume the defendant's state of mind simply because an "intelligent speaker" would have realized their statement was false. 466 U.S. at 511-13. What matters is whether the defendant himself "realize[s] his folly" at the time of publication. *Id.* at 513; *see also Dunn*, 193 F.3d at 1200 (Eleventh Circuit

similarly recognizing "it is Defendants' subjective view, not [anyone else's], that determines whether the [defendant acted] with actual malice").

The Ninth Circuit's decision in *Newton*, 930 F.2d 662, a defamation-by-implication case cited approvingly for Alabama's defamation-by-implication standard, *see Finebaum*, 854 So. 2d at 1124-25, is instructive. There, a jury found that NBC had acted with actual malice when it aired a broadcast that, Wayne Newton argued, implied he struck financial deals with the mafia. *Newton*, 930 F.2d at 680. In upholding the verdict, the district court "concluded that since NBC had 'voluntarily edited and combined the audio with the visual portions of the broadcast in a way that created the defamatory impressions' and since those impressions were 'clear and unescapable,' the jury could reject as incredible the testimony of the NBC journalists that they had not intended to leave the false impression." *Id.* The Ninth Circuit reversed, holding that, because the actual malice inquiry is subjective, it is error to infer the defendants "intended to convey the defamatory impression" simply because that impression is "clear and inescapable" to the court. *Id.* at 681. Such an approach "eviscerates the First Amendment protections established by *New York Times* and *Bose*" because it elevates the court's "own view" of the impression of the publication for that of the defendant's, which is the critical inquiry. *Id.*

That is precisely what the district court did here. Although the court recognized that "every SMP and Highway 31 witness denied" that they had intended

the Ad to imply that Moore solicited sex from Miller, and although there was no contrary evidence, the court nonetheless found the Ad *itself* could constitute clear and convincing evidence of actual malice because the court felt its defamatory impression was obvious. *See* Doc. 252 at 28 ("Moore's best evidence of SMP's intent or indifference was the Ad itself."); *id.* at 44 (same); *id*. at 55 ("The Ad speaks for itself.").

This was error, unsustainably in "conflict with the principles of *New York Times* and *Bose*." 930 F.2d at 680. This Court must instead determine whether Moore put forward affirmative evidence of "convincing clarity that [SMP] acted with the requisite state of mind." *Id.* at 682. He did not.

### 3. SMP's unrebutted testimony precludes a finding that Moore established actual malice.

The testimony was unrebutted that SMP did not intend to imply that Moore specifically solicited sex from Miller. *See supra* at 18-19. The structure of Ad itself reflects that first and second quote were meant to convey different ideas: the quotations appear on separate slides, are expressly sourced to different articles, and use different verbs to describe Moore's actions—with the second stating that Moore "approached" Miller, not that he "solicited" her. Ex. 1. (SMP, of course, did not choose the word "solicitation" in the first place; a journalist did, whom SMP quoted directly.)

SMP's testimony concerning intent is also corroborated by its vetting document—created before the Ad aired—which reflects SMP's vision of the Ad as highlighting five separate allegations about Moore's conduct that were already in the public domain. *See* Ex. 162 (pictured *supra* at 16-17). Moore's failure to introduce a single piece of evidence that contradicted this, despite obtaining hundreds of documents in discovery, is itself telling.

But even if the Court were to conclude that there was clear and convincing evidence that the implication was intentional, reversal is still required because Moore did not establish by clear and convincing evidence that SMP believed the alleged implication was false when it published the Ad. The unrebutted testimony was that SMP *did* believe that Moore was seeking sex from Miller when he approached her. *See* Doc. 228 at 77-79; Doc. 229 at 224-225. Although SMP does not need to show that subjective belief was reasonable under the actual malice standard, *see Michel v. NYP Holdings, Inc*., 816 F.3d 686, 702-03 (11th Cir. 2016), SMP *did* make this showing given the extensive reporting that Moore had a reputation for "prey[ing] upon girls in the mall," Ex. 120 at 2, and was banned from the mall for "soliciting sex from young girls" as a general matter. Ex. 3 at 2. If Moore in fact had some other, innocent reason for approaching 14-year-old Miller (whom he did not know) to tell her she was "pretty"—when he otherwise had a reported habit of "preying on girls" at the mall and "soliciting sex" from them—an outside

observer's conclusion that he approached Miller to solicit sex could not support a finding of actual malice, even if that conclusion was wrong. *See Time, Inc. v. Pape*, 401 U.S. 279, 292 (1971) (an "error in judgment" does not support a finding of actual malice); *see also Annette F. v. Sharon S.*, 119 Cal. App. 4th 1146, 1170 (2004) (explaining statements that are "technically incorrect" but "have some element of truth to them are logically less susceptible to [] a finding" of actual malice). Indeed, if SMP made an error of judgment in believing the Ad to be truthful, it was a mistake made by others, as well. When Moore demanded the Ad be taken down, TV stations airing it reviewed the underlying research and reached the same conclusions about the Ad's truthfulness that SMP did, allowing the Ad to remain on air. *See supra* at 18.

In sum, and particularly given the complete lack of "documentary evidence which showed that" SMP knew the Ad false "or entertained serious doubts about its accuracy," Moore failed to establish actual malice by clear and convincing evidence. *See Long v. Arcell*, 618 F.2d 1145, 1148 (5th Cir. 1980) (holding even conflicting testimony concerning defendant's state of mind, in light of a lack of documentary evidence, does not constitute clear and convincing evidence of actual malice).[4]

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

### C. Moore did not present any other evidence that would establish clear and convincing evidence of actual malice.

Even if this Court did not credit SMP's own testimony about its intent, the proper approach would be to set that testimony aside, *see Hammet v. Paulding County*, 875 F.3d 1036, 1052 (11th Cir. 2017), and examine whether there is affirmative evidence that establishes clear and convincing proof of actual malice. There is not. In fact, the rest of the record rebuts an inference of actual malice.

#### 1. Disbelief of SMP's testimony does not establish clear and convincing evidence of actual malice.

In *Bose*, the Supreme Court explicitly held that disbelief of a defendant's testimony as to its state of mind "does not constitute clear and convincing evidence of actual malice." 466 U.S. at 512. And in that case, because there was no affirmative, "independent evidence that [the defendant] realized the inaccuracy of the statement, or entertained serious doubts about its truthfulness," the record could not sustain a finding of actual malice. *Id*. at 512-14. So too here.

This principle is particularly important in the defamation-by-implication context. That is, even if a defendant's testimony as to its own intent is not believed, plaintiffs cannot establish liability for defamation-by-implication in the absence of independent evidence showing "that the defendants themselves knew of, much less intended," the defamatory statement. *Kendall*, 716 F.3d at 93; *Newton*, 930 F.2d at 680-81 (reversing jury verdict in defamation-by-implication case because jury's

38

disbelief of defendant's intentions could not constitute clear and convincing evidence of actual malice under *Bose*). As one court recently cautioned, public-figure plaintiffs like Moore "cannot rely solely on the chance that the jury declines to credit the defendant's testimony denying that he had the necessary state of mind." *Palin v. New York Times Co.*, 588 F. Supp. 3d 375, 407 (S.D.N.Y. 2022). Independent, affirmative evidence is required. *See id.* For this reason, too, the district court erred in relying on the jury's (alleged) disbelief of SMP's witnesses to serve as affirmative evidence of actual malice. *See* Doc. 252 at 58.

### 2. The remaining evidentiary record weighs strongly against a finding of actual malice.

Engaging in fact-checking or research before publication, as SMP did here, negates an inference of actual malice. *See Time Inc.*, 401 U.S. at 291. The Supreme Court has explained why: "The publisher who maintains a standard of care such as to avoid knowing falsehood or reckless disregard of the truth [should be] given assurance that those errors that nonetheless occur will not [expose him to] liability." *Id.* This principle has endured for decades. *See, e.g.*, *Berisha*, 973 F.3d at 1316 n.8 (considering the defendant had attempted to research and verify his claims in holding plaintiff could not prove actual malice, even where defendant was alleged to have "fabricated" certain details); *Levan*, 190 F.3d at 1241-43 (reversing jury verdict after considering that ABC had researched and "double-checked" statements in the broadcast); *Silvester v. Am. Broad. Cos., Inc.*, 839 F.2d 1491, 1498 (11th Cir. 1988)

(considering that the publication was researched in affirming lack of actual malice); *Palin*, 588 F. Supp. 3d at 408 (explaining that that a pre-publication fact-check is "inconsistent" with an "intentional or reckless publication of false information").

The undisputed evidence was that SMP thoroughly vetted and fact-checked the Ad before publication. In fact, the Ad was fact-checked twice, pre-production and post-production. *See supra* at 15. Twice, SMP went "line by line by line by line [to] make sure that every single thing [was] factually accurate," creating a research document "that showed it was accurate . . . side by side with each line." Doc. 229 at 188; *see also* Ex. 162. As SMP's Research Director Astiz testified, this process left her with no doubts that the Ad was true and accurate. Doc. 229 at 226. There was no contrary evidence.

In affirming the jury's verdict, the district court did not address the evidence showing the Ad was thoroughly vetted. The closest the court came was *crediting* Astiz's testimony that SMP read the stories about Miller, which it ironically then used to draw a negative inference against SMP. Doc. 252 at 43-44. That logic is backwards; SMP's vetting of the Ad weighs *against* actual malice, not for it.

The Ad's direct citation of its sources also negates an inference of actual malice. As this Court explained in *Michel*, "[w]here a publisher gives readers sufficient information to weigh for themselves the likelihood of [a statement's] veracity, it reduces the risk that readers will reach unfair (or simply incorrect)

40

conclusions, even if the publisher itself has." 816 F.3d at 703. For this reason, "[e]vidence that an article contains information that readers can use to verify its content tends to undermine claims of actual malice." *Klayman v. City Pages*, 650 F. App'x 744, 751 (11th Cir. 2016).

Here, directly underneath each of the Ad's five quotations, SMP did just this—including a citation to the source quoted and the date of publication, encouraging the audience to read the articles for themselves. *See* Ex. 1. Indeed, that was the whole point of the Ad, which "provided the citation from where the quotes were pulled from" precisely because SMP wanted the viewer "to investigate, read more, learn more for themselves." *See supra* at 18-19. Thus, even if SMP itself drew "unfair (or simply incorrect) conclusions" from those articles, the Ad's inclusion of its sources "reduce[d] the risk that readers" would do the same, weighing against an inference of actual malice. *Michel*, 816 F.3d at 703.

Both of these factors independently weigh against an inference of actual malice. Taken together, and considered with SMP's own testimony, they are devastating to Moore's claim of actual malice. *See Arcell*, 618 F.2d at 1148; *Levan*, 190 F.3d at 1241. And, without a showing of actual malice, neither of Moore's claims survives. *See Smith v. Huntsville Times Co., Inc.*, 888 So. 2d 492, 496 n.1 (Ala. 2004) (holding false-light claims require same showing of actual malice as defamation claims).

41

**D.    The district court's reasons for finding actual malice were legally erroneous.**

As previously discussed, the district court erred when it allowed "the Ad itself" to serve as clear and convincing evidence of SMP's intent to convey that Moore solicited sex from Miller, the first element that Moore had to prove. *See supra* at 33-35. But the district court also made two other legal errors relating to actual malice—*first*, by allowing a lack of prior reporting expressly stating that Moore solicited sex from Miller to serve as "proof" of knowledge of falsity, which led it to wrongly conclude this was an "altered quote" case, and *second*, by allowing Moore to establish actual malice based on what was, at most, a poor choice of words.

**1.    A lack of prior reporting expressly stating Moore solicited sex from Miller is not proof of knowledge of falsity.**

The district court concluded that SMP must have known the assertion that Moore solicited sex from Miller was false simply because there was no prior reporting that expressly stated that Moore had "solicit[ed] sex" from Miller. Doc. 252 at 14. This badly understands First Amendment precedent and principles. While the existence of prior reporting *disproves* actual malice as a matter of law, *see Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 862 (5th Cir. 1978), the converse is not true. What matters is *the defendant's subjective belief* about the truth or falsity of the statement. *See supra* at 27. Here, all witnesses testified SMP believed the Ad was true when it ran and had good reason to so believe. *See supra* at 18.

42

The district court's fixation on the lack of prior reporting that explicitly stated that Moore "solicited sex" from Miller led the court to make another error—to wrongly conclude that this is an "altered quote" case, in the line of *Masson v. New Yorker Magazine*, 501 U.S. 496 (1991). Doc. 252 at 17. But this case is strikingly different than *Masson*, in which a journalist recorded taped interviews with the defendant and later *deliberately*, and "*with full knowledge of the inaccuracy*, used quotation marks to attribute to [the plaintiff] comments he had not made." 501 U.S. at 499 (emphasis added). Whole quotations were entirely fabricated, which injured Masson by ascribing views to him that he did not hold. *Id.* at 502, 511. The Supreme Court ultimately found actual malice where that defendant made a "deliberate" and defamatory "material change" to a quotation the journalist attributed to Masson that he had not made. *Id.* at 517.

In contrast, here, the Ad did not alter *any* quotes. It contained five quotations, every single one of which was accurately reproduced from its source. *See* Exs. 1-5. None were purportedly a quotation by Moore about Moore. Furthermore, unlike the defendant in *Masson*, who admitted to knowingly and deliberately altering (indeed, wholly fabricating) the quotes at issue, SMP repeatedly testified to the opposite. Similarly, unlike the defendant in *Masson*, who knew her underlying quotes were false, the undisputed record evidence here is that SMP believed that Moore *was*

43

seeking sex from Miller when he approached her. *See supra* at 19. In short, *Masson* has no application here.

This Circuit has previously rejected attempts to apply *Masson* as the district court did, even in circumstances where the defendant *has* altered a plaintiff's speech. In *Lovingwood v. Discovery Communications*, 800 F. App'x 840 (11th Cir. 2020), for example, the parties agreed that Discovery altered the plaintiff's original statements. This Court explained, however, that in determining "whether Discovery acted with actual malice . . . the mere fact that the film contains altered historical dialogue is not, in itself, evidence that Discovery made statements with knowledge that they were false, for purposes of the *New York Times* standard." *Id.* at 848. Instead, this Court considered Discovery's vetting of the broadcast and the context in which it was aired in holding Discovery had not acted with actual malice. *Id.* at 847-49. The Court emphasized that there was "no [] evidence showing that anyone at Discovery had actual doubts about the scene or real awareness that the scene might be problematic." *Id.* at 850. "To the contrary," the film had been fact-checked, and the employee responsible for fact-checking testified he was fully satisfied with that process, *id.* at 850. For that reason, the *Lovingwood* case was "not like *Masson*." *Id.* at 849. The same is true of this case.

This Court has also rejected attempts to apply *Masson* where, as here, the publication does not suggest to the viewer that it is presenting an objective,

disinterested viewpoint. In *Masson*, the Court considered that the article was published in an outlet which had "a reputation for scrupulous factual accuracy," was presented as "nonfiction," and gave the reader "no clue" that the direct quotations it attributed to Masson were not actually said by him. 501 U.S. at 513. In contrast, in *Lovingwood*, this Court considered that, although the film did alter the plaintiff's speech and began with the title card, "This is a true story," the viewer would understand that the film was dramatized and not presented as "a disinterested, objective narrative." 800 F. App'x at 847-48.

The context of this Ad—which was expressly identified as a political advertisement, *see* Ex. 1—is even further afield from the factual news publication in *Masson* or dramatized film in *Lovingwood*. Although SMP believed the Ad was truthful and would not have published it otherwise, *see supra* at 15, courts have repeatedly recognized that reasonable viewers are generally "skeptical" of statements made in a campaign against "a political opponent," and do not assume they present an unbiased perspective. *Seith v. Chicago Sun-Times, Inc.*, 371 Ill. App. 3d 124, 138 (2007); *McLaughlin v. Rosanio, Bailets & Talamo, Inc.*, 331 N.J. Super. 303, 312-13 (App. Div. 2000).

For these reasons, the district court's persistent failure to consider the evidence regarding SMP's subjective state of mind and intent was error. SMP's subjective state of mind is critical here, evidenced not only by SMP's unrebutted

testimony, but also by its fact-checking and citation of sources to the viewer, all of which weigh against an inference of actual malice, just as in *Lovingwood*.

### 2. Complaints about editorial judgment or imprecise language are not proof of actual malice.

The First Amendment does not require exacting precision in speech. *See Bose*, 466 U.S. at 513-14. For that reason, the First Amendment "cautions courts against intruding too closely into questions of editorial judgment, such as the choice of specific words." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir. 1986) (citing *Miami Herald Pub. Co. v. Tornillo,* 418 U.S. 241 (1974)).

But that is precisely what the district court did, allowing Moore to elevate what was—at most—an imprudent use of the word "One" to substitute as proof of actual malice. *See* Doc. 252 at 49-55. Indeed, Moore's claim for actual malice rose and fell entirely on the Ad's inclusion of this single word. As Moore's counsel argued at trial, "If the ad was worded 'he was banned from the mall for soliciting sex from young girls,' period, and then the next sentence says, 'He approached Wendy Miller who was a Santa's helper,'" that would have "clearly draw[n] a distinction" between those statements. Doc. 229 at 245.

The First Amendment does not permit liability because SMP "could have written a clearer sentence." *Janklow,* 788 F.2d at 1304. To the contrary, "[c]omplaints or disagreements about choice of language are editorial decisions that do not give rise to liability." *Newton*, 930 F.2d at 685-86. Or, as the Supreme Court

has put it: a defendant's use of "imprecise language" does not establish actual malice. *Bose*, 466 U.S. at 492. That is, at most, what SMP is guilty of here: a poor choice of words when transitioning from one line of the Ad to another. But to find this establishes actual malice runs contrary to binding precedent, which demands the "breathing space" needed for free speech to survive. *Id.* at 513.

## II. The Ad is not sufficiently materially false to sustain a finding of actual malice.

As the Supreme Court has "long held," "actual malice requires material falsity." *Hoeper*, 571 U.S. at 246. Where a publication "accurately convey[s] 'the gist' of the situation," an immaterial falsity is not sufficient to prove actual malice. *Id.* at 255. Here, because the Ad accurately conveyed the gist of the reporting about Moore's sexual advances on young girls, the Ad was not materially false, an independent basis for reversal.

### A. The "gist" or "sting" of the Ad is true.

The district court's conclusion that Moore proved material falsity was based on a fundamentally flawed inquiry. In short, the district court found material falsity because it believed SMP changed the AL.com article in a "material" way—from "told her she looked pretty" to "solicited sex." Doc. 252 at 1-2, 5-6. This approach was not only at odds with the plain text of the Ad (which said Moore "approached" Miller, not that he "solicited" her), but it asked the wrong question as a matter of law. Under binding Eleventh Circuit precedent, the relevant question is whether the

Ad *as a whole* was materially false. *See Levan*, 190 F.3d at 1240-41 (entire broadcast determines gist); *Berisha*, 973 F.3d at 1316 (entire book determines gist).

Here, the Ad's "gist" or "sting" is that there were many reports that Moore had a troubling pattern of making sexual advances towards teenage girls—including very young ones.[5] SMP proved this was true, precluding a finding of actual malice. Gray testified to her personal experience of Moore's regular attempts to hit on girls as young as 12 to 15. *See supra* at 19. Miller herself testified that Moore persistently flirted with her and then tried to take her on dates until her mother reported him to security. *See supra* at 20. Thomas testified that during a period in the late 1970s, he received approximately ten complaints from "young girls, teenage girls," whom Moore was trying to date or pick up—including a complaint from Miller's mother that Moore had engaged in "unwanted sexual solicitation" of her daughter. *See supra* at 20-21. Although Moore disputed that he specifically solicited Miller for sex, that denial, even if believed, does not show the overall gist of the Ad is false.

*Berisha* is particularly instructive. In that case, this Court determined the "gist" of the defendant's book was that Berisha was involved in the "Albanian criminal underworld." 973 F. 3d at 1315. Although Berisha argued that the defendant "intentionally fabricated at least two details in the book," this Court held that "even

---

[5] The Court determines the "gist" of the publication for itself. *Levan*, 190 F.3d at 1240 & n.29; *Hoeper*, 570 U.S. at 250.

if that were true . . . [it would not] reasonably cast doubt on whether [the defendant] harbored serious doubts about his broader depiction of Berisha"—that is, of someone involved with Albanian gangs, so as to make the book materially false. *Id.* at 1314; *see also Levan*, 190 F.3d at 1240 n.31, 1244 (reversing jury verdict because even if there were "false or misleading" statements in the broadcast, they did "not alter the gist of the story," and did not show ABC "entertain[ed] serious doubts that the gist of its broadcast was true"). Here, too, the evidence does not show that SMP harbored "serious doubts" about the Ad's gist; to the contrary, it is unrebutted that SMP believed the allegations against Moore, *see supra* at 14-15, 18.

Although SMP had no obligation to do this, SMP proved not only that the Ad's "gist" was true, but also that it was true that "people who know Roy Moore" say that Moore was "actually banned from the Gadsden Mall for soliciting sex from young girls" and that one of those girls was Miller. Indeed, Thomas testified that he knew Moore and banned him from the mall after Moore made an "unwanted sexual solicitation" towards Miller. *See supra* at 20. Whether or not Moore in fact solicited sex from Miller is beside the point. The Ad posits a specific factual claim, that people who knew Moore say these things, and SMP proved it was true. That in itself precludes any finding of material falsity.

49

**B.    The Ad is not materially false given the pleaded "truth" of the allegations against Moore.**

The Ad also cannot be materially false for yet another independent reason: The "truth" of the matter—what had actually been reported about Moore's conduct—would not have meaningfully changed the average viewer's perspective of Moore.

"[A] materially false statement is one that would have a different effect on the mind of the reader or listener from that which the truth would have produced." *Hoeper*, 571 U.S. at 250 (cleaned up). Here, the "truth" is that Moore was reported to have fondled a 14-year-old (Corfman) and sexually assaulted a 16-year-old (Nelson) when he was in his thirties. *See supra* at 4-6. And of course, it was true that Moore was reported to have solicited sex from young girls at the Gadsden Mall *generally*. *See supra* at 5.

Moore cannot seriously contend the "truth" of the allegations against him were significantly better in the mind of the average viewer than what the Ad reported. They were not. And because they were not, the Ad was not materially false as a matter of law. *See, e.g.*, *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1107 (10th Cir. 2017) (holding "[a] misstatement is not actionable if the comparative harm to the plaintiff's reputation is real but only modest") (quotation omitted).

## III. The jury instructions were erroneous and prejudicial to SMP by allowing Moore to establish liability and damages based on non-actionable statements.

Moore's failure to prove actual malice by clear and convincing evidence and the Ad's lack of material falsity are independently sufficient to reverse the verdict. This Court should resolve those issues first. There is no reason to re-try the case if the Ad is not materially false or if this Court's independent review reveals Moore failed to prove actual malice. If, however, this Court concludes that SMP is not entitled to judgment as a matter of law, then it should hold that SMP is entitled to a new trial because the district court erred in instructing the jury on both liability and damages over SMP's repeated objections and those errors prejudiced SMP. *See S.E.C. v. Yun*, 327 F.3d 1263, 1281-82 (11th Cir. 2003).

On appeal, this Court "examine[s] whether the jury instructions and verdict form, considered as a whole, were sufficient so that the jurors understood the issues and were not misled." *McNely*, 99 F.3d at 1072 (quotation omitted). The Court must consider the context in which the jury received the instructions, including "the evidence presented" and "the arguments of counsel." *Christopher v. Cutter Lab'ys*, 53 F.3d 1184, 1190-91 (11th Cir. 1995). "[W]hen 'it is impossible to know . . . whether the jury imposed liability on a permissible or an impermissible ground' the judgment must be reversed." *Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 11 (1970) (citing *Sullivan*, 376 U.S. at 284).

Here, it is impossible to know whether the jury imposed liability on a permissible or impermissible ground. Given the obvious risk that the jury would be confused about the issues in dispute, SMP repeatedly asked the district court to clarify the false statement at issue for the jury. *See* Doc. 173 at 5 (SMP's pretrial request for instruction); Doc. 203 at 7 (SMP's proposed edits to jury instructions on the false statement at issue). The district court, over SMP's objection, refused to issue SMP's requested instruction or otherwise clarify the allegedly false statement at issue for the jury because it believed, erroneously, that Moore could prove falsity if he could show that *any* part of the Ad was false. Doc. 229 at 10-13; *see also* Doc. 252 at 20. As a result, the final jury form simply asked the jury if "SMP made *a* false statement about Moore." Doc. 206 at 7 (emphasis added).

But falsity and actual malice cannot be divorced from each other as a matter of law. Because the definition of actual malice requires that the defendant subjectively understand the risk that his statement is false, proving the falsity of *that statement* is necessarily a precondition to finding actual malice. *See Sullivan*, 376 U.S. at 279-80; *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986).

The evidence presented and Moore's counsel's arguments only further confirm the jury was likely misled about what false statement was at issue. *See Christopher*, 53 F.3d at 1190-91. Moore spent most of the trial trying to prove he was not "actually banned" from the Gadsden Mall. *See supra* at 13, 23. And Moore's

counsel spent significant time with SMP and Highway 31's witnesses on this issue. *See, e.g.*, Doc. 228 at 87 (Q: "Would you agree that the ad might have been more accurate if it said something like 'sources say' or, you know, 'it is a rumor that Moore was banned from the Gadsden Mall'?"); Doc. 228 at 71-72 (similar).

Moore's counsel compounded the confusion in closing, telling the jury, "there is no way to watch that ad and think that it is true. [SMP] didn't give you an actual mall ban." Doc. 225 at 33, 65. These kinds of arguments invited the jury to find falsity if they believed Moore was not *actually* banned from the mall, or if they had any other reason to disbelieve the Ad's first statement, which the district court had already ruled was not actionable as a matter of law, *see supra* at 11. Under these circumstances, this Court cannot conclude the instructions had "no tendency to confuse or to mislead the jury with respect to the applicable principles of law." *Mosher*, 979 F.2d at 824; *see also McNely*, 99 F.3d at 1072, 1078 (reversing on this basis).

The jury's confusion likely extended to its determination of actual malice. Although SMP pressed for the jury to have to answer two precise questions on actual malice (*first*, did SMP intend the implication about *Miller*, and *second*, did SMP know *that* implication was false or was reckless to its falsity), *see supra* at 31-32, the jury instead was asked whether SMP "knew that *a* statement was false or acted

with reckless disregard to whether *a* statement was false" without specifying what precise false statement was at issue. Doc. 207 at 1 (emphases added).

A similar error likely affected the jury's determination on damages. SMP argued it was necessary to explain to the jury that any damages award needed to be based on harm specifically caused by the Ad's assertion that Moore solicited sex from Miller, as opposed to any other statement. Doc. 203 at 7-8, 11, 14 (SMP's proposed revisions to jury instructions); Doc. 204 at 2 (SMP's proposed revisions to verdict form). The district court instead asked the jury only whether "SMP's publication of a false statement or false information about Moore" caused Moore harm. Doc. 207 at 2; Doc. 206 at 13. This wording exposed SMP to the significant possibility that the jury awarded damages for the Ad's statement that "Moore was actually banned from the Gadsden Mall for soliciting sex from young girls," which, even if it were false, could not have been said with actual malice. *See supra* at 11. Such recovery is plainly foreclosed under the *Sullivan* standard. *See* 376 U.S. at 279-80 (allowing damages only if the statement is made with actual malice).

In light of the evidence presented and arguments of counsel, the jury instructions presented pervasive risk that the jury did not understand the issue in dispute or was misled in determining falsity, actual malice, or damages, if not all three, which necessitates reversal. *McNely*, 99 F.3d at 1072.

## IV.   The jury's $8.2 million compensatory award was excessive.

Because the jury was permitted to award Moore damages for statements that were not made with actual malice, the jury's award must be reversed under the First Amendment. *See supra* at 54. As a separate matter, an award of $8.2 million in compensatory damages to a man who, before the Ad aired, was subject to a media firestorm that credibly reported he sexually assaulted girls as young as 14 when he was in his thirties—for his "loss of reputation"—is absurd.

Alabama courts find a jury award excessive where the damages suggest "the jury must have been misled by some mistaken view of the merits of the case" or when "the court can clearly see that the verdict has been reached on account of bias, passion, prejudice, corruption, or other improper motive or cause." *Vest v. Gay*, 275 Ala. 286, 288 (1963). Both circumstances are present here, and the district court abused its discretion in concluding otherwise.[6]

As SMP has explained, the jury likely had a mistaken view of which "false" statement was at issue. *See supra* at 51-52. If the jury *did* understand the sole issue relevant for damages—how much reputational damage and mental anguish SMP caused for the Miller implication *alone*—then its award of $8.2 million in

---

[6] The district court improperly applied *Hammond v. City of Gadsden*, 493 So. 2d 1374 (Ala. 1986) in determining the damages were not excessive, a standard Moore put forward, *see* Doc. 246 at 11-12, which only applies when damages are "legally and mathematically ascertainable," such as for lost wages. 493 So. 2d at 1378.

compensatory damages suggests it must have been motivated by some improper motive. No other conclusion is reasonable in light of Moore's complete lack of evidence of damages resulting from the relevant statement in the Ad itself. Indeed, there is no reason to believe that SMP caused more than nominal damages—even *Moore* admitted that he could not connect his damages to the Ad specifically, let alone the Ad's only actionable statement. *See supra* at 22; *see also Simon*, 895 F.2d at 1319 (in *per se* defamation case, considering the plaintiff's existing "tarnished reputation" in weighing what compensatory damages were reasonable).

To SMP's knowledge, the compensatory damage award here is significantly larger than any other compensatory award for defamation in Alabama history— including for defamation related to sexual abuse. The next largest compensatory award SMP has been able to identify was $1.25 million in a case where a plaintiff showed clear economic loss after the defendant falsely claimed his business was run by terrorists. *See Daphne Auto. v. Pensacola Motor Sales*, No. CV-2010-900230, 2011 WL 7657768 (Ala. Cir. Ct. Oct. 31, 2011). The award the jury issued here is even more outsized when compared to recent Alabama defamation cases involving false sexual abuse allegations. *See, e.g.*, *Lakey v. Matthew Ross Gilham Media, Inc.*, No. CV-2012-902306, 2015 WL 10719179 (Ala. Cir. Ct. Dec. 7, 2015) ($22,820 for plaintiff falsely accused of sexually abusing a child under age 12); *Hill v. Birmingham Broad. (WVTM-TV) LLC*, No. CV-2014-904839.00, 2018 WL

56

10613854 (Ala. Cir. Ct. Oct. 22, 2018) ($250,000 to plaintiff falsely identified as sex offender). Here, the jury awarded Moore more than three hundred times the award in *Lakey*.

The record compels the conclusion that the damages award is likely explained (if not by a misunderstanding of the merits of the case) by bias or prejudice against SMP. Moore testified to his hometown jury that the allegations about him were political lies "out of Washington D.C." Doc. 224 at 181; *see also* Doc. 222 at 196 (attributing damage to the "Washington D.C. establishment"). Moore's counsel took every opportunity to characterize SMP as a Washington D.C. outsider attempting to interfere in Alabama politics. *See, e.g.*, Doc. 228 at 64-65, 91-93; Doc. 225 at 22-23. Moore's counsel even faulted SMP for relying on reporting from outlets like *The New York Times* or *Washington Post*—publications he claimed had lied about former President Trump, Doc. 225 at 27-28, and he suggested had lied about Moore, too. Finally, in closing, Moore's counsel invited the jury to issue an award not based on any evidence connecting the Ad to any harm Moore suffered, but instead to punish the Washington D.C. establishment and "the media," urging the jury to award Moore "enough money . . . to make the media pay attention." *See supra* at 23.

These kinds of arguments, which pit "a prominent local public figure" against an outside speaker before a local jury, pose a substantial danger that "First Amendment values will be subverted." *Newton*, 930 F.2d at 671. Given that risk,

this Court has an obligation to exercise "judicial control over excessive jury verdicts" in First Amendment cases to ensure "the constitutional guarantee of freedom of speech" is not chilled, *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 160 (1967), as other courts have done before it. *See, e.g.*, *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 141 (2d Cir. 1984) (reversing defamation verdict for excessiveness); *Douglass v. Hustler Mag., Inc.*, 769 F.2d 1128, 1143 (7th Cir. 1985) (same).

## CONCLUSION

By requiring public-figure plaintiffs to prove that a defendant subjectively entertained doubts about the publication's truthfulness before that speech can be punished, courts properly ensure "breathing space" for free debate, where erroneous statements are "inevitable." *Sullivan*, 376 U.S. at 271-72. Given the difficulty in proving actual malice, one might assume Moore put forward compelling evidence of SMP's state of mind at the time the Ad was published. He did not. That the district court itself concluded that Moore's "best evidence" of actual malice was the "Ad itself" is probative only of Moore's failure to carry his burden.

SMP published the Ad in good faith. It was thoroughly vetted, and it got the "gist" of the story right, no matter how it was understood. Upholding the verdict would have chilling repercussions for speech where speech should be at its most robust.

SMP respectfully asks this Court to vacate the district court's judgment and remand the case with instructions to enter judgment in favor of SMP. In the alternative, this Court should order a new trial under corrected instructions or substantially remit the damages.

Dated: March 14, 2024

Respectfully submitted,

*s/ Marc. E. Elias*

Barry Alan Ragsdale
**Dominick Feld Hyde, PC**
1130 22nd St. South, Suite 400
Birmingham, AL 35205
Telephone: (205) 536-8888
BRagsdale@dfhlaw.com

William B. Stafford
**Elias Law Group LLP**
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0176
BStafford@elias.law

Marc E. Elias
melias@elias.law
Christina Ford
cford@elias.law
**Elias Law Group LLP**
250 Massachusetts Ave NW
Suite 400
Washington, DC 20001
Telephone: (202) 968-4490
Facsimile: (202) 968-4498

*Attorneys for Appellant Senate Majority PAC*

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 12,981 words, excluding the parts that may be excluded. This response also complies with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface, 14-point Times New Roman.

*s/ Marc E. Elias*